Pierce v. Zoetis, Inc. Ms. Fitzell. Good morning, Your Honors. May it please the Court, my name is Joni Fitzell on behalf of Kelly Pierce. We are asking that the Court remand this case just on the issue of tortious interference with the business relationship. And based on the injurious falsehood, the question becomes, does the injurious falsehood rise to the level of an illegal act? Now, these claims would have fit much more comfortably under Title VII, would they not? Yes, Your Honor, they would have, but in the timeline of events, Ms. Pierce turned in her complaint to HR who said, hold on, we're investigating it. It was almost six months to the day when she was fired. And the statute of limitations for Title VII and for the Indiana civil rights law is six months. Of course, she could have just filed a complaint with the Indiana agency and or the EEOC, even though HR was looking at it. Yes, Your Honor, that is true. But she believed that she had followed her handbook. She was doing what she was supposed to as an employee and reported to HR and left them to investigate. They asked her not to do anything further. Do you have any concrete evidence of pecuniary injury or harm to sales arising from Huchert's alleged comments at that national awards banquet? Well, that was the final comment. Her other comments that were made during her visits to the veterinarians produced lost sales. You see, what I'm trying to figure out is how exactly an accusation of infidelity amount to disparaging her business or her products. Well, it disparaged her as a person amongst her. Well, that's the point that the law that you are required to move under at this point is an economic tort. Yes, Your Honor. It's not defamation and it's not any of the relatives of defamation. Injurious falsehood sometimes is functionally defamation. Sometimes if there's an economic element to it, it's different. But as a standalone, I don't see how you can proceed if really all you have is her argument that she's been defamed effectively. Well, Your Honor, we, of course, this is a 12B6 motion, so no discovery was made where we could show pecuniary losses. But they need at least to be alleged. I don't see where even that happens. Can I ask if what the statements by Ms. Heuchert were, were they in the scope of her work as a supervisor at the company? And so if we're talking about tortious interference as a tort by a third party interfering with a relationship, if she's acting as a supervisor of the defendant company, then it's really not as a third party interfering with a relationship. Yes, Your Honor, I agree. While she was making comments, inappropriate comments, as Ms. Pierce's supervisor, to say that a sexual harassing and sexually inappropriate comments are within the scope of the employment of the supervisor, I don't believe that it extends to her duties as a supervisor to violate what would be Title VII by, through a sexually hostile work environment or through the comments. But that's the problem, isn't it? I mean, that's why there's this backdoor issue. The Indiana courts seem pretty clearly to say that if you've got a problem under the civil rights law, there are procedures that are important to Indiana, exhaustion procedures. They're very common. They exist at the federal level as well. The other things that Heuchert did, like increasing her sales quotas and so on, may have been unfair, but they were surely the kinds of things she could do as a supervisor. Yes, Your Honor, I agree that her sales quota levels were part of the duties. The comments, however, were not. The environment was not. But I don't see how the comments are anything but injurious, slanderous, kind of bizarre, inappropriate, disgusting. No, they're awful comments, but how they become an economic tort is not clear to me. Your Honor, it is the totality and the timeline of the events is the comments. She goes off for surgery. Her quotas are increased. She comes back just after the six-month deadline, and she is terminated. Have you abandoned your claims against Zoetis? Zoetis was dismissed by the court, but yes. So it is just Ms. Heuchert. So we're just focused on one issue and with Ms. Heuchert. Okay. If there are no further questions. No, you can save the rest of your time if you wish for rebuttal. Thank you. Thank you. Ms. Abrahams. I just have to ask you if Heuchert ever received any disciplinary action as a result of her comments. She did, Your Honor. May it please the Court, Nadine Abrahams for the appellee Lois Heuchert. As the Court has stated, we are here on whether Ms. Heuchert, the plaintiff, has stated a claim of tortious interference with the business relationship between plaintiff and Zoetis. We maintain that the lower court correctly dismissed the claim against Ms. Heuchert for several reasons. First of all, there is no illegal act, and under Indiana state law, as the Seventh Circuit has upheld, you need an illegal act to form the basis for the tortious interference claim. Here the plaintiff is saying that the illegal act is this injurious falsehood. We maintain that injurious falsehood is not applicable here. As the Court has stated, injurious falsehood is more akin to pecuniary loss, commercial loss, and generally comes up in product disparagement cases. Can I ask you where the illegality element comes from and why that was added as an element to this kind of claim? I believe it was added because the courts were making distinctions between intentional interference with the contractual relationship, and when you don't have a contractual relationship and it's a third party who is intervening and tortiously interfering with the relationship, the courts added an additional element, which is that there has to be some type of illegal conduct to further the ends. And that was dating back to the 1960s and has been upheld as an element of tortious interference under Indiana state law since that time. So is the word illegal understood to mean civil, criminal, both? It hasn't been defined. What the courts have done is they've looked at what doesn't necessarily constitute an illegal act. And in one of the cases that the plaintiff cited and the lower court cited, Levy, they specifically held that defamation, even though in and of itself is illegal, is not a sufficient illegal act to satisfy the illegality standard. It might help to understand why illegality was added as an element to then understand what counts to be illegal. So they added illegality as an element, but to what end? What distinction were they trying to draw between a contractual relationship and a non-contractual relationship that illegality was doing some work? And I think that, I mean, it's hard to say what was in the court's mind in the 1960s, but I think that because it's much easier to have a contractual, it's clear if you have an interference with a contract, whether the contract has been breached. Here it's just an interference with the business relationship, and especially in the context of the employment relationship, where it's not necessarily a third party, but it's in the context of a supervisor and an employee, that they do require that there is supposed to be that additional element. And here, regardless of whether she had satisfied illegality, which we maintain she hasn't, because there is no pecuniary loss, and there is no illegal means. So even if injurious falsehood could be an illegal act, there's no link between the injurious falsehood statement, which was both allegedly made to plaintiff and a co-worker, what are the two of you sleeping in the same room? You're always together. Whether that comment somehow injured the plaintiff and was made with the intent, which is required through the re-statement of tort, so it interprets injurious falsehood, has been intent that actually led to some kind of pecuniary loss. There's no plausible connection that a comment made nine months before her termination was made with the intent that somehow the person who heard that comment would take action that would result in her termination. How much higher were her sales quotas than those of her fellow employees who were similarly situated? Although we didn't, because it's a motion to dismiss and we didn't engage in discovery, the quotas were within the same realm as her other co-workers. They were all set consistently with each other, and she was not treated any differently when it came to sales quotas. So everyone's went up. Yes. Was she an at-will employee? Yes, she was an at-will employee, and that's the second aspect to our argument, is that even if Ms. Hootcher was acting illegally, the acts were within the scope of her employment. Setting quotas, you know, putting aside the comment, which obviously we concede would not have been within the scope of her employment, but setting quotas, going with her on visits to veterinarians, coaching her about her training or her ability to sell product was all within the scope of her employment. And the Indiana State Courts, as well as the Southern District of Indiana and Lesley, the Lesley decision said that acts within the scope of a supervisor's employment cannot rise to the level of tortious interference. Even if they were motivated by personal bias or jealousy or revenge, they still do not take it outside the scope of the employment, because to do so would basically destroy the Indiana at-will employment. Would it be possible for someone to make a personal attack on another, maybe about, I don't know, their trustworthiness or something similar, which would also constitute injurious falsehood under Indiana law? I think if it's against an individual's personal reputational interests, it would fall under defamation, and it wouldn't fall under the case law and the restatement of torts analysis of what is injurious falsehood. And in this case, she did not bring a defamation claim against Ms. Huchard. And in essence, just like with the Title VII claim that's not before the court, she's trying to backdoor in some type of defamation claim by claiming that the injurious falsehood is the basis for the tortious interference. Okay. And unless there are further questions, we rest on our briefs. All right. Thank you very much. Anything further, Ms. Fixon? Just shortly, Your Honor. I do want to make a correction as far as the quotas. Ms. Pierce's quotas were raised to 130%, while many of her coworkers' quotas were reduced. So, no, they were not all raised. She actually had an inordinate amount of raise on her quotas. But, again, she was off work at that time due to surgery, so she wouldn't reach her quota anyhow. And in Indiana Insurance Company v. North Vermillion, the court stated that a personal injury disparagement included damage to his good reputation in the community by harassing, embarrassing, and subjecting him to ridicule and humiliation by others. Nowhere in that case did it state that it had to be commercial products for that type of defamation and these types of statements. Although Ms. Abrahams touched on something that I think is quite important, which is that Indiana has been very protective of its employment at will doctrine, and it has not recognized many, I'll say, very standing common law-based exceptions to that apart from, say, workers' compensation and maybe another small one. And it has said instead, you know, if you've got a problem under some other, it's for the legislature to establish these exceptions, and if the legislature has done so, you have to follow their rules. And so that leaves her kind of out there trying to say hurtful and inappropriate things were said about me, but how we link that up with the right not to lose the job is tough. Yes, Your Honor, I agree it is tough, and I think that the plaintiff's position in this case is where do you draw the line as to where the supervisory's duty and ability to make statements and sexually harass an employee. Okay. Thank you, Your Honor. Well, thank you very much. Thanks to both counsel who take the case under advisement.